IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JUNELL FAITH ALIVIADO and JAMIQUIA GLASS, | ) ) ) | Civ. No. 12-00259 SOM-BMK |
| Plaintiffs, | ) ) ) | ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION |
| vs. | ) ) | |
| SHARI KIMOTO, Mainland Branch Coordinator, Department of Public Safety, State of Hawaii, in her individual and official capacities; JEANETTE BALTERO, Contract Monitor, Department of Public Safety, State of Hawaii, in her individual and official capacities; TED SAKAI, Interim Director, Department of Public Safety, State of Hawaii, in his official capacity; and DOES 1-30, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I.        **INTRODUCTION.**

Plaintiffs Junell Faith Aliviado and Jamiquia Glass allege that Defendants Shari Kimoto, Jeanette Baltero, and Ted Sakai are allegedly interfering with their constitutional right to marry.[1]  Plaintiffs want to marry State of Hawaii prison inmates now housed, pursuant to a state contract, at the Saguaro Correctional Center in Arizona.  The Department of Public Safety

---

[1] The Amended Complaint also listed Lenora Santos as a Plaintiff, but Santos voluntarily withdrew her claims.  ECF No. 41.

for the State of Hawaii ("DPS") requires prisoners to obtain approval to marry. Applications to marry submitted by Plaintiffs' fiancés to marry Aliviado and Glass have been repeatedly denied by DPS. Plaintiffs seek damages from Defendants, who are DPS employees, and injunctive relief.

Plaintiffs have moved for an order preliminarily enjoining Defendants from interfering with their right to marry their incarcerated fiancés. They argue that they have an overwhelming likelihood of success on their claim that Defendants have violated the Fourteenth Amendment of the United States Constitution by interfering with their fundamental right to marry, and that the continuing violation of their constitutional right to marry is causing them irreparable injury in the form of being denied the emotional, spiritual, and legal benefits of marriage. Plaintiffs also argue that the balance of hardships tips sharply in their favor, as Defendants "would suffer no discernible harm" if a preliminary injunction were granted. Finally, Plaintiffs contend that granting an injunction is in the public interest because it would ensure the protection of constitutional rights. Concluding that all four preliminary injunction factors weigh in favor of granting the requested injunction, the court grants Plaintiffs' motion.

**II.      FINDINGS OF FACT.**

This court held an evidentiary hearing on July 12, 2012, receiving direct testimony through its usual nonjury trial procedure of having direct testimony submitted in declaration form and having witnesses available for live cross-examination and redirect examination. The parties have also stipulated to certain facts.

From Plaintiffs, the court received the declarations of Junell Faith Aliviado, Jamiquia Glass, and Laurie Temple, and excerpts from the deposition of Shari Kimoto. At the hearing, Kimoto was cross-examined by Defendants and provided testimony on redirect examination by Plaintiffs.[2]

From Defendants, the court received the declaration of Shari Kimoto, with no live cross-examination requested. The court also received various documents as exhibits. Based on the testimony and exhibits received in evidence, the court finds the following facts.

To the extent any finding of fact should more properly be designated a conclusion of law, it should be treated as a conclusion of law. Similarly, to the extent any conclusion of

---

[2]  In an effort to rule promptly on the merits and to avoid the burden on the court's over-extended court reporters, the court did not request and therefore does not have final transcripts of the live testimony. Therefore, in referring to that testimony in these findings of fact, this court is unable to give exact page and line citations to the testimony.

law should more properly be designated a finding of fact, it should be treated as a finding of fact. For ease of reference to particular findings and conclusions in later proceedings, if any, the findings and conclusions are presented in sequential numbered paragraphs.

1. Plaintiffs Junell Faith Aliviado and Jamiquia Glass want to marry prison inmates now held by the State of Hawaii at the Saguaro Correctional Center in Arizona. Stipulated Facts ¶¶ 5, 17, ECF No. 48; Decl. of Junell Faith Aliviado ("Aliviado Decl.") ¶ 2, ECF No. 10-4; Decl. of Jamiquia Glass ("Glass Decl.") ¶ 2, ECF No. 10-7.

2. Plaintiff Jamiquia Glass is engaged to Reginald Pettway. Stipulated Facts ¶ 5. Glass and Pettway have been dating since 2007, approximately two and a half years before Pettway was incarcerated. Id. ¶ 7; Glass Decl. ¶ 2. Glass lives in Mobile, Alabama, and visits Pettway approximately once a month. Stipulated Facts ¶ 6; Glass Decl. ¶ 3. They speak on the phone daily and frequently write to one another. Id.

3. Glass loves Pettway and describes him as her "best friend." Glass Decl. ¶ 4. She has strong religious convictions and wants to marry Pettway for religious and spiritual reasons. See id.

4. Plaintiff Junell Faith Aliviado is engaged to James G. Freitas, Jr. Stipulated Facts ¶ 17. Aliviado and

4

Freitas have been dating for seven years and began their relationship approximately one year before Aliviado was incarcerated. Aliviado Decl. ¶ 2. They speak on the phone nearly every day, sometimes more than once a day. Id. ¶ 3.

5. Aliviado visits Freitas two to three times a year. Stipulated Facts ¶ 18. She last visited him in April 2012 and hopes to visit him again this coming October. Aliviado Decl. ¶ 3. Aliviado and Freitas conduct video visits with one another approximately every other month. Id. They also exchange letters. Id. Aliviado wants to marry Freitas because she feels close to him. Id. ¶ 9. She hopes they can get married when she visits him in October. Id. ¶ 10.

6. Plaintiffs and their fiancés meet the legal requirements for marriage. They are over eighteen years old and not married. Stipulated Facts ¶¶ 16, 26. Neither Plaintiff is related to her fiancé. Id. Both couples can afford the marriage application fees in Hawaii and Arizona. Id.

7. A State of Hawaii inmate must obtain permission from DPS to marry any individual, including a nonprisoner. Stipulated Facts ¶ 1. An inmate seeking to marry must submit a DPS application that includes a section to be completed by the individual the inmate seeks to marry. Stipulated Facts ¶ 2. Although DPS treats the marriage application as submitted by the inmate, DPS will accept a completed application from the person

the inmate seeks to marry, provided the application is complete.
Deposition of Shari Kimoto ("Kimoto Dep.") at 42:22-43:20, ECF
No. 46-3; Redirect Examination of Shari Kimoto.

8.    Once received by DPS, the application is reviewed
by a social worker, who makes a recommendation as to whether the
application should be granted or denied.  Kimoto Dep. at 40:2-18.
The recommendation goes to Defendant Kimoto, who determines
whether to grant or deny the application.  Id. at 40:2-18.
Kimoto's decision is reviewed by the Institutions Division
Administrator and the Deputy Director for Corrections.  Id. at
41:8-42:21.  The Deputy Director makes the final determination as
to whether the application should be granted or denied.  Live
Cross-Examination of Shari Kimoto.

9.    DPS promulgated its current policy governing
inmate marriages on June 8, 2011.  Stipulated Facts ¶ 3.  That
policy, COR.14.13, states that a warden shall consider the
following factors in determining whether to grant or deny an
inmate's application to marry:

> 1) Whether or not a legal restriction to
> marriage exist[s] (i.e. not divorced yet, TRO
> history that can be verified)
>
> 2) Whether or not the proposed marriage
> presents a threat to the security or the good
> government of the institution or to the
> protection of the public.

Declaration of Daniel M. Gluck ("Gluck Decl.") at Ex. 4
(Stipulated Ex. 1) at 1, ECF No. 10-18.

6

10.   The DPS policy regarding visitation, COR.15.01, is similar to COR.14.13.  The visitation policy states, "Visitation may be denied if it is determined that a visitor is detrimental to the rehabilitation and/or reintegration of an inmate or there is a threat to the security and/or good government of the facility concerned."  Gluck Decl. at Ex. 5 (Stipulated Ex. 10) at 1, ECF No. 10-18.

11.   Kimoto is unaware of any standards used by DPS when it applies its marriage policy.  Kimoto Dep. at 47:18-23.  DPS provides no training to its social workers to determine whether an inmate presents a threat to the security or good government of an institution or to the general public.  Id. at 47:24-48:01.

**Jamiquia Glass.**

12.  Glass and Pettway submitted their first marriage application in 2010.  Stipulated Facts ¶ 8; Glass Decl. ¶ 5.  DPS denied the application by letter from Kimoto, dated October 4, 2010.  The letter stated:

> As a Ward of the State incarcerated in a correctional facility, you are incapable of providing the necessary emotional, financial and physical support that every marriage needs in order to succeed.  Records indicate that your parole hearing is April 2016.
>
> We believe that a healthy relationship effort (marriage) established at this time while you are in prison and unable to work and communicate effectively face-to-face with your fiancée will be detrimental to any

> future reintegrative efforts. Both
> husband/wife must work uniformally [sic] on
> individual and marital issues that come up
> throughout any successful marriage. This
> union may be successful overall for both
> individuals when you are reunited outside of
> the facility's walls allowing the proper
> opportunity to work together, develop and
> establish appropriate relations as necessary.

Glass Decl. at Ex. 1 (Stipulated Ex. 3), ECF No. 10-8.

13.   On an unknown date thereafter, Glass and Pettway submitted another marriage application. Stipulated Facts ¶ 9. That application was denied by a nearly identical letter from Kimoto, dated May 17, 2011. Id. Kimoto describes the letter as a "form letter" and does not know where it originated. Kimoto Dep. at 63:14-24.

14.   Both applications were submitted and denied before DPS promulgated the current version of COR 14.13.

15.   On June 27, 2011, Pettway appealed the denial of his second marriage application. Stipulated Facts ¶ 10. Michael Hoffman, the Institutions Division Administrator, responded on behalf of the Director of DPS by letter dated October 8, 2011. Id. The letter stated:

> After review of the matter, I believe you
> should initiate another request. Once I
> receive your request from the Mainland
> Branch, I will take your appeal into
> consideration and render a decision since at
> this time it does not appear there are any
> reasons for a denial. This letter should not
> be construed as an approval for marriage as
> the second request needs to be initiated and

the approval/disapproval will be made at that
time.

Glass Decl. at Ex. 3 (Stipulated Ex. 5), ECF No. 10-10.

16.    Pettway and Glass submitted another marriage

application after receiving Hoffman's letter.  Stipulated Facts

¶ 11.  On January 11, 2012, DPS denied the application, again by

letter from Kimoto.  <u>Id.</u>  The letter stated:

> Records indicate that Ms. Glass has been
> convicted of Conspiracy to Rob 5 Banks, Bank
> Robbery, and Conspiracy to Commit Bank
> Robbery and served probation/prison time
> under the Bureau of Prisons and the U.S.
> Probation Office.  In addition, she was
> convicted of Theft of Property and was held
> under the care and custody of the Alabama
> Department of Corrections.
>
> In accordance with PSD Policy COR.14.13,
> associating or being in the company of a
> convicted felon (state/federal) presents a
> threat to the security and good government of
> the facility.

Glass Decl. at Ex. 4 (Stipulated Ex. 6), ECF No. 10-11.

17.    Glass was convicted of three felonies in the

1990s for crimes she committed when she was 20 years old.

Stipulated Facts ¶ 15; Glass Decl. ¶ 9.  She was sentenced to

time in prison and was released in 2000.  <u>Id.</u>

18.    Pettway wrote Kimoto a letter at the end of

January 2012 asking her why Glass's criminal record was

preventing their marriage.  Stipulated Facts ¶ 13; Glass Decl.

¶ 11.  Defendant Jeanette Baltero responded on behalf of Kimoto

in a letter dated February 27, 2012, stating:

> The Department of Public Safety denied your
> marriage to Ms. Glass based on information
> provided in both your applications and
> institutional file.  Ms. Glass had a criminal
> history and although her convictions [were]
> years ago, the Department determined that
> based on policy associating or being in the
> company of a convicted felon presents a
> threat to the security and good government of
> the facility and does not recommend marriage
> at this time.

Stipulated Facts ¶ 13; Glass Decl at Ex. 5 (Stipulated Ex. 7), ECF No. 10-12.

19.   According to DPS, Glass and Pettway's marriage application was denied based on a purported threat to the security or good government of the facility.   Stipulated Facts ¶ 14.

20.   Although she had written correspondence denying Glass and Pettway's marriage application, Kimoto had actually recommended approval of their final application, only to be overruled by the Deputy Director for Corrections, Joe Booker. Decl. of Shari Kimoto ("Kimoto Decl.") ¶ 10, ECF No. 34-1.

21.   The denials of the marriage applications caused Glass pain.  Glass Decl. ¶ 13.  She was particularly upset that she was unable to marry Pettway based on her past felony convictions.  Id.  She has worked hard to turn her life around and has had no trouble with the law since her release from prison.  Id. ¶ 9.

22.    The Saguaro Correctional Center has a policy that inmates' visitors must be "clear of any felony" for five years. Kimoto Dep. at 82:2-8.  There are currently no restrictions on Glass's ability to visit or speak with Pettway that are not applied to all other visitors.  <u>Id.</u> at 85:04-09.  She is able to visit Pettway in person, talk with him over the phone, and put money into his accounts.  <u>Id.</u> at 87:11-20.

23.    If Glass and Pettway marry, the Saguaro Correctional Center will not restrict contact between Glass and Pettway, nor will it permit Glass and Pettway to have any additional contact.  <u>Id.</u> at 89:19-25; 95:1-23.  The Saguaro Correctional Center will not have to change any of its practices if Glass and Pettway are married; DPS will only have to update Pettway's inmate record.  <u>Id.</u> at 95:4-8.

**Junell Faith Aliviado.**

24.    Aliviado and Freitas first applied to be married approximately five years ago.  Aliviado Decl. ¶ 4.  That application was denied by DPS.  <u>Id.</u>

25.    Aliviado and Freitas submitted a second application on July 5, 2011.  Stipulated Facts ¶ 20; Aliviado Decl. ¶ 5.  That application was denied by a letter from Kimoto dated August 9, 2011.  <u>Id.</u>  The letter is nearly identical to the form letters received by Pettway and states that Freitas is "incapable of providing the necessary emotional, financial and

physical support that every marriage needs in order to survive."
Aliviado Decl. at Ex. 1 (Stipulated Ex. 8), ECF No. 10-5.

26. On November 28, 2011, after Aliviado had spoken with an official from the State of Hawaii's Office of the Ombudsman, Aliviado and Freitas submitted another marriage application to DPS. Stipulated Facts ¶ 21; Aliviado Decl. ¶¶ 6-7. That application was also denied by a letter from Kimoto dated December 20, 2011, stating:

> Records indicate that you were convicted of sexually assaulting your biological child from the age of 8 to 17. Ms. Aliviado currently has a minor in her care and custody.
>
> In accordance with PSD Policy COR.14.13, your conviction of sexually assaulting your own biological child who was a minor at the time of the assaults and knowing that your fiancé [sic], Ms. Aliviado has a minor child in her care and custody, presents a threat to the protection of the public.

Aliviado Decl. at Ex. 2 (Stipulated Ex. 9), ECF No. 10-6.

27. Aliviado and Freitas's application was denied based on a purported threat to public safety. Stipulated Facts ¶ 25. DPS has no policy prohibiting sex offender inmates from marrying individuals with minor children. Kimoto Dep. at 64:21-24.

28. Aliviado's only minor child is sixteen years old; her three other children are adults. Stipulated Facts ¶ 22.

29. Freitas's sentence will end in approximately ten years. Id. ¶ 24. His parole hearing is scheduled for August 23, 2022. See Aliviado Decl. at Ex. 1 (Stipulated Ex. 8). Freitas is not subject to a mandatory minimum and may be eligible for release prior to the conclusion of his sentence. Stipulated Facts ¶ 24; Kimoto Decl. ¶ 13.

30. The parole board, not DPS, determines whether an inmate is eligible for parole. Kimoto Dep. at 62:10-14. As far as Kimoto knows, DPS did not consult with the parole board before denying Aliviado and Freitas's marriage application. Id. at 62:15-25.

31. Aliviado was heartbroken and sad for months after her marriage applications were denied. Aliviado Decl. ¶ 9.

**Previous Denial of an Inmate's Marriage Application.**

32. In November 2010, DPS denied the marriage application of another inmate housed at the Saguaro Correctional Center using the same form letter that Kimoto initially sent to Pettway and Freitas. See Gluck Decl. at Ex. 1 (Stipulated Ex. 13), ECF No. 10-14.

33. On December 1, 2010, Plaintiffs' counsel sent Kimoto a letter on behalf of that inmate's fiancée, demanding that Kimoto cease interfering with the couple's fundamental right to marry and that DPS review and revise its policies. Gluck Decl. at Ex. 2 (Stipulated Ex. 13), ECF No. 10-15. In a letter

dated December 7, 2010, Thomas Read (a former DPS official) stated that the inmate's marriage application had been "reconsidered" and conditionally granted. Gluck Decl. at Ex. 3 (Stipulated Ex. 14), ECF No. 10-16.

## III.  CONCLUSIONS OF LAW.

1.   A plaintiff seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (citations omitted). This court may also grant a preliminary injunction when there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff," so long as the plaintiff "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (quoting Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)) (quotation marks omitted).

2.   When a claimant seeks an injunction requiring a party to take action, "courts should be extremely cautious about issuing a preliminary injunction," and "should deny such relief 'unless the facts and law clearly favor the moving party.'" Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1319–20 (9th Cir.

1994) (quoting <u>Anderson v. United States</u>, 612 F.2d 1112, 1114
(9th Cir. 1980)).  In general, mandatory injunctions "are not
granted unless extreme or very serious damage will result and are
not issued in doubtful cases or where the injury complained of is
capable of compensation in damages."  <u>Anderson</u>, 612 F.2d at 1115.
**Likelihood of Success on the Merits.**

> 3.   The Fourteenth Amendment to the United States
Constitution guarantees Plaintiffs and their fiancés the
fundamental right to marry.  <u>See, e.g.</u>, <u>Zablocki v. Redhail</u>,
434 U.S. 374, 383 (1978) (reaffirming that the right to marry is
fundamental).  Prisoners maintain their fundamental right to
marry while incarcerated.  <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 95
(1987) (stating that <u>Zablocki</u> applies to prison inmates).
Plaintiffs argue that their right to marry is being interfered
with by Defendants' continued refusal of the marriage
applications that they and their fiancés have submitted to DPS.

> 4.   Generally, state action that interferes with a
fundamental right is subject to strict scrutiny.  <u>See, e.g.</u>,
<u>Zablocki</u>, 434 U.S. at 388; <u>United States v. Juvenile Male</u>,
670 F.3d 999, 1012 (9th Cir. 2012).  Under the strict scrutiny
test, the challenged action must be "narrowly tailored to serve a
compelling state interest."  <u>Juvenile Male</u>, 670 F.3d at 1012.

> 5.   Strict scrutiny does not apply in some prison
contexts.  In <u>Turner</u>, 482 U.S. at 89, the Supreme Court stated

that "when a prison regulation impinges on inmates'
constitutional rights, the regulation is valid if it is
reasonably related to legitimate penological interests."  The
Court then applied that standard in determining that a prison
regulation relating to inmate marriages unconstitutionally
deprived the plaintiffs of their fundamental right to marry.  The
regulation in issue permitted marriages only with the permission
of the superintendent of the prison and provided that such
approval was to be given only "when there are compelling reasons
to do so."  Id. at 82.  The prison officials contended that the
regulation was related to security and rehabilitation.  Id.
at 97.

6.    With respect to security, the prison officials
said that the regulation prevented "love triangles" that could
lead to violent confrontations between inmates.  Id.  Although
security was a legitimate penological interest, the Supreme Court
concluded that the regulation was not reasonably related to that
interest.  The Court viewed the regulation as an "exaggerated
response," noting that there were "obvious and easy alternatives"
that accommodated the right to marry "while imposing a *de minimis*
burden on the pursuit of security objectives."  Id. at 98 (citing
the requirement in 28 C.F.R. § 551.10 that a warden generally
permit inmate marriages, unless the warden finds that the
marriage presents a threat to the security or good order of the

institution, or to public safety).  There was also nothing in the record showing that the regulation had actually been intended to prevent love triangles.  Indeed, inmate rivalries were just as likely to develop in the absence of formal marriages.  Id.

7.  With respect to rehabilitation, the prison officials said they were trying to help women inmates avoid abuse at home and become self-reliant.  Id. at 97.  They contended that women inmates were often overly dependent on male figures.  Id.  However, by requiring the superintendent to refuse marriage applications absent a compelling reason, the regulation "swept more broadly" than could have been explained by the prison's stated objectives.  Id. at 98.  The prison officials' rationale gave rise to no objection to male inmates' marriage requests or to inmate-civilian marriages, but the regulation prohibited those marriages as well.  Id. at 99.

8.  The Supreme Court also concluded that the proffered rehabilitation interest was suspect.  Id.  Only one marriage had actually been refused on the ground that it might foster excessive dependence.  Id.  In addition, the district court had found that the prison system in issue had "operated on the basis of excessive paternalism," in that marriage requests by all female inmates had been scrutinized carefully even before adoption of the regulation in issue, whereas marriage requests by male inmates had been routinely approved.  Id.  Thus, the "almost

complete ban" on marriages could not be said to be reasonably
related to any legitimate penological interest and was invalid.
Id.

9.   In Johnson v. California, 543 U.S. 499, 509
(2005), the Supreme Court clarified that the "reasonably related
to legitimate penological interests" test articulated in Turner
was not necessarily applicable in every case involving prisoners'
assertions of rights usually requiring the application of strict
scrutiny.  The Court noted that the Turner test had been applied
"only to rights that are 'inconsistent with proper
incarceration.'"  Id. at 510 (quoting Overton v. Bazetta, 539
U.S. 26, 131 (2003)) (emphasis in original).

10.   Plaintiffs argue that this court should apply
strict scrutiny because they are asserting violations of their
own right to marry, not their inmate-fiancés' right to marry.  In
Turner, 482 U.S. at 96-100, the Supreme Court made clear that a
regulation infringing on an inmate's right to marry another
inmate would be subject to the "reasonably related to legitimate
penological interests" test.  However, as recognized by
Plaintiffs, the Supreme Court declined to say whether a
regulation infringing on a nonprisoner's right to marry an inmate
requires the application of strict scrutiny because it implicates
a nonprisoner's fundamental right.  Id. at 97.  The Turner court
did not reach that question because it concluded that, "even

18

under the reasonable relationship test, the marriage regulation [in issue did] not withstand scrutiny." Id.

11.     This court similarly need not determine on the present motion whether Plaintiffs' claims require application of strict scrutiny.  Defendants' refusal to allow Plaintiffs to marry their fiancés is likely not reasonably related to legitimate penological interests.

12.     Plaintiffs do not appear to be challenging the DPS inmate marriage policy, COR.14.13, on its face.  Plaintiffs are challenging COR.14.13 as it has been applied to Plaintiffs and their fiancés.  In ruling on an as-applied challenge, this court examines whether the application of COR.14.13 to Plaintiffs is reasonably related to legitimate penological interests.  See Bahrampour v. Lampert, 356 F.3d 969, 975 (9th Cir. 2004) ("The Turner analysis applies equally to facial and 'as applied' challenges." (citing Morrison v. Hall, 261 F.3d 869, 905, 907 (9th Cir. 2001)); Hargis v. Foster, 312 F.3d 404, 410 (9th Cir. 2002).

13.     In Turner, the Supreme Court identified four factors relevant to determining if a prison regulation is reasonably related to legitimate penological interests.

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it.  Thus, a regulation cannot be sustained where the logical connection between the regulation and the

asserted goal is so remote as to render the policy arbitrary or irrational.  Moreover, the governmental objective must be a legitimate and neutral one . . . .

A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates . . . .

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally . . . .

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation.  By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns . . . .

482 U.S. at 89-91 (internal citations omitted).

14.   The Ninth Circuit considers the first <u>Turner</u> factor--whether the regulation in issue is rationally related to a legitimate penological interest--a "*sine qua non.*"  <u>Morrison</u>, 261 F.3d at 901 (quoting <u>Walker v. Sumner</u>, 917 F.2d 382, 385 (9th Cir. 1990)).  In <u>Prison Legal News v. Cook</u>, 238 F.3d 1145, 1151 (9th Cir. 2001), the Ninth Circuit did not even consider the other three <u>Turner</u> factors once it determined that the defendants had not shown that the regulation in issue was rationally related to a legitimate penological interest.

15.   "Ordinarily, 'even in the absence of institution-specific or general social science evidence, as long

20

as it is plausible that prison officials believed the policy
would further a legitimate objective, the governmental defendant
should prevail on <u>Turner</u>'s first prong.'" <u>Cal. First Amendment
Coal. v. Woodford</u>, 299 F.3d 868, 881 (9th Cir. 2002) (quoting
<u>Frost v. Symington</u>, 197 F.3d 348, 355 (9th Cir. 1999)).
"However, if the regulation's challengers present sufficient (pre
or post) trial evidence that refutes the common-sense connection
between a legitimate objective and a prison regulation, the state
must present enough counter-evidence to show that the connection
is not so remote as to render the policy arbitrary or
irrational." <u>Id.</u> (quoting <u>Frost</u>, 197 F.3d at 355) (quotation
marks omitted and format altered).

     16.   The court agrees with Defendants that they have
likely identified legitimate penological interests for
prohibiting Plaintiffs' marriages.  Defendants purport to have
denied Glass's application out of concern for the security and
good government of the prison, and they contend that Aliviado's
application was denied because her proposed marriage to Freitas
posed a threat to the safety of the public.  However, Defendants'
reasons for believing that the security of the prison or the
safety of the public would be threatened by Plaintiffs' marriages
do not appear to be rationally related to those interests.

     17.   Defendants denied Glass and Pettway's marriage
application to prevent Pettway from associating with Glass

because she is a convicted felon.  The court does not see how prohibiting their marriage actually prevents Pettway from associating with Glass.  Plaintiffs' evidence demonstrates that DPS already permits Glass and Pettway to associate with one another; Glass visits Pettway in person, talks to him on the phone, and puts money into his account.  If married, Glass and Pettway will not be entitled to any additional privileges allowing them to associate more than they do now.

18.     Defendants also do not explain why a marriage between Glass and Pettway poses a security risk at all.  Glass has visited Pettway many times, and there is no evidence that she has done anything suspicious.  Although she is a convicted felon, Defendants do not challenge Glass's contention that she has had no legal trouble since being released from prison in 2000. Moreover, Glass has been permitted to visit Pettway despite the regulation permitting DPS to deny visitation when it poses a threat to the security or good government of the prison.  The court fails to see how the marriage of Glass to Pettway could pose a security risk if Glass's visitation does not.  Defendants present no counter-evidence showing that their refusal to allow Glass and Pettway to marry is in fact connected to prison security.

19.     With respect to Aliviado, Defendants apparently want to prevent Freitas from sexually assaulting Aliviado's

sixteen-year-old minor child.  However, the court does not see how preventing the marriage of Aliviado and Freitas has any impact at all on any threat Freitas allegedly poses to Aliviado's child.

20.  Defendants appear to be prohibiting the marriage of Aliviado to Freitas with the hope of limiting Freitas's contact with Aliviado's child once Freitas is released from prison.  But DPS will have no authority to prohibit any marriage or contact when Fretias is no longer incarcerated, and Aliviado and Freitas do not need the legal status of marriage to spend time together or cohabitate.

21.  In addition, as Plaintiffs point out, Freitas's sentence is not presently scheduled to end for many more years. His parole hearing is scheduled to be held in 2022, long after Aliviado's sixteen-year-old child becomes an adult.  Although, as Defendants argue, Freitas may be released early, Defendants are at this point only speculating that he will be released while Aliviado's child is a minor or living with her.  See Cal. First Amendment Coal., 299 F.3d at 882 (holding that the first Turner factor was not satisfied in part because a justification given for the prison regulation in issue was purely speculative).

22.  Even if Freitas is released while Aliviado has a minor child in her custody, the court questions whether Defendants' speculation that Freitas will sexually assault that

child is sufficient to prohibit marriage. There is no DPS policy preventing sex offenders from marrying individuals with minor children. Defendants fail to present any evidence that prohibiting a marriage is rationally connected to the safety of Aliviado's child, or any other member of the public. If Aliviado wants to be with Freitas once he is released, marriage has no bearing on whether Aliviado's child will come into contact with Freitas. While DPS may want Aliviado to take precautions to protect her child, a prohibition on marriage is not a rational means of achieving that goal.

23. Even if there were a rational connection between prohibiting Plaintiffs' marriages and Defendants' legitimate penological interests such that the first Turner factor were satisfied, the three remaining Turner factors would not militate in favor of upholding the DPS action. With respect to the second Turner factor--whether alternative means exist for inmates to exercise their right to marry--there are no alternative ways for Plaintiffs and their fiancés to marry, as inmates must obtain permission from DPS. The third factor--the impact of allowing Plaintiffs and their fiancés to marry and the allocation of prison resources--also weighs in favor of Plaintiffs. If Plaintiffs are allowed to marry, it appears that the only impact on Defendants would be that Defendants would need to coordinate the logistics of the weddings such as the dates and times, and

update DPS records once the marriages are complete.  Finally, the fourth factor--whether alternatives to Defendants' challenged conduct exist--appears to favor Plaintiffs or be neutral at most. Plaintiffs do not identify any alternatives, but Defendants could conceivably restrict Glass's visitation if she indeed posed a security risk, or recommend to the parole board that Freitas's relations with Aliviado's minor child be monitored.

24.    The court thus concludes that Plaintiffs are likely to succeed on the merits of their claim that Defendants are unlawfully interfering with their constitutional right to marry.

**Irreparable Harm.**

25.    Having concluded that Plaintiffs are likely to succeed on the merits, the court turns to the preliminary injunction requirement of irreparable harm.  "An alleged constitutional infringement will often alone constitute irreparable harm."  Goldie's Bookstore, Inc. v. Superior Court of Cal., 739 F.2d 466, 472 (9th Cir. 1984) (citing Wright & Miller, 11 Federal Practice and Procedure § 2948 at 440 (1973)). Plaintiffs are suffering irreparable harm by being continuously denied their right to marry.  The Supreme Court has stated that marriage is an expression of emotional support and public commitment, that marriage carries spiritual significance, and that marriage is often a precondition to the receipt of

government benefits, property rights, and other less tangible
benefits.  <u>Turner</u>, 482 U.S. at 95.  Every day that Plaintiffs are
unable to marry they are denied these benefits.  Plaintiffs are
also experiencing emotional harm, in that they are "upset,"
"sad," and "heartbroken."

26.    The court is not persuaded by Defendants'
argument that Plaintiffs will not suffer irreparable harm absent
a preliminary injunction because they have been, and will
continue to be, able to regularly visit and speak to their
fiancés.  Defendants fail to recognize the many emotional, legal,
and social benefits of marriage that Plaintiffs are seeking, as
well as the emotional harm that Plaintiffs are suffering because
they are unable to marry.

**Balance of Equities.**

27.    The third factor in the injunctive relief
analysis concerns the balance of equities.  The court agrees with
Plaintiffs that the balance of equities tips in their favor.
Defendants argue that the equities favor denying the injunction
because granting the injunction will effectively preclude
adjudicating this case on the merits, as it would provide all the
relief Plaintiffs seek in their complaint.  That is incorrect.
Although granting the injunction will afford Plaintiffs all the
injunctive relief they have requested, Plaintiffs are also
seeking money damages.

26

28.    Defendants also argue that granting the
injunction will undermine the ability of DPS to enforce valid
prison regulations.  The court disagrees.  The requested
injunction relates to one DPS regulation, COR.14.13, as applied
to two individuals and their inmate-fiancés.  The injunction will
not preclude the lawful enforcement of COR.14.13, or any other
DPS regulation.  To the extent Defendants are arguing that DPS
will be discouraged from enforcing its own regulations out of
fear that it will be further enjoined, those speculative concerns
do not outweigh Plaintiffs' fundamental right to marry or the
irreparable harm they are suffering.

**Public Interest.**

29.    The public interest factor also weighs in favor
of Plaintiffs.  Remedying constitutional violations is in the
public interest.  See United States v. Raines, 362 U.S. 17, 27
(1960) ("[T]here is the highest public interest in the due
observance of all the constitutional guarantees."); G & V Lounge,
Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir.
1994) ("[I]t is always in the public interest to prevent the
violation of a party's constitutional rights.").

30.    Of course, as Defendants argue, it is also in the
public interest to ensure that prisons are operated safely, but
there is no evidence that allowing Plaintiffs to marry their

fiancés threatens the safety of the Saguaro Correctional Center
or the public.

**Whether an Injunction May Issue.**

31.   The evidence does not support Defendants'
argument that, even if the requested injunction is granted,
Plaintiffs will not be able to marry their fiancés because
employees in Pinal County, Arizona, are not presently traveling
to prisons to issue marriage licenses.   The Pinal County Clerk's
Office has informed Plaintiffs' counsel that a county employee
need not go to the prison for an inmate to be married.   Decl. of
Laurie A. Temple ¶ 6, ECF No. 37-1.   An inmate's fiancée may pick
up a marriage license and an affidavit from the clerk's office
and take the documents to the prison, where they can be signed in
front of a notary.   <u>Id.</u>   The inmate's fiancée would then return
the signed documents to the clerk's office.   <u>Id.</u>

**IV.      CONCLUSION.**

Plaintiffs' motion seeking a preliminary injunction is
granted.   Defendants are ordered to allow Plaintiffs to marry
their fiancés without further interference.   Plaintiffs and their
fiancés need not reapply for permission to marry from DPS.

Plaintiffs need not post a bond under Rule 65(c) of the
Federal Rules of Civil Procedure.   Defendants have not opposed
Plaintiffs' request that no bond be required, and this case
involves a matter of public interest.   <u>See</u> <u>Save our Sonoran, Inc.</u>

v. Flowers, 408 F.3d 1113, 1126 (9th Cir. 2004) (recognizing that it may be appropriate in public interest litigation not to require a bond or to require only a nominal bond); Barahona-Gomez v. Reno, 167 F.3d 1228, 1237 (9th Cir. 1999) (holding that district courts have discretion to waive the bond requirement under Rule 65(c)).

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 1, 2012.



      /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Aliviado v. Kimoto; Civil No. 12-00259 SOM-BMK; ORDER GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION